**NIFTY FOODS CORPORATION,**
Plaintiff-Appellant,

v.

**The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. and Pet Incorporated, Defendants-Appellees.**

**No. 20, Docket 79–7195.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1979.

Decided Jan. 24, 1980.

---

Philip B. Abramowitz, Buffalo, N. Y., Gross, Shuman, Brizdle, Laub & Gilfillan, Buffalo, N. Y., Douglas J. Lustig, Rochester, N. Y., Laverne, Sortino & Hanks, Rochester, N. Y., on brief, for plaintiff-appellant.

Marshall Cox, New York City (Cahill, Gordon & Reindel, New York City, Stacy J. Haigney and P. Kevin Castel, New York City, of counsel), for defendant-appellee Great Atlantic & Pacific Tea Company, Inc.

Richard W. Hulbert, New York City (Cleary, Gottlieb, Steen & Hamilton, New York City, Christopher H. Lunding and Jonathan I. Blackman, New York City, of counsel), for defendant-appellee Pet Incorporated.

Before LUMBARD, SMITH and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Western District of New York, Harold P. Burke, *Judge*, dismissing plaintiff's civil action based on antitrust, breach of contract, unfair competition and other claims.

This suit was prompted by a decision of the Great Atlantic & Pacific Tea Company ("A&P") to substitute Pet Incorporated ("Pet") for Nifty Foods Corporation ("Nifty") as the supplier of A&P's private label frozen waffles. Nifty filed a complaint in 1971, naming A&P and Pet as co-defendants and charging in seven counts breach of contract, unfair competition, tortious inducement of breach and violation of the antitrust laws. Since Nifty and A&P are both citizens of the State of New York, jurisdiction was apparently predicated on the alleged violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and 28 U.S.C. § 1331.

After seven years of discovery, Nifty indicated that it was ready for trial. A&P then moved for summary judgment on one count under Fed.R.Civ.P. 56 and for an order dismissing three other counts for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Pet moved for summary judgment on all six of the counts in which it was named and A&P joined in the motion with respect to the counts remaining against A&P. In an order dated October 24, 1978, all of the above motions were granted, and all the claims against A&P and Pet were dismissed. Nifty filed a notice of appeal. For the reasons given below, we affirm.

I.

Nifty, a manufacturer of frozen foods, began supplying A&P with frozen waffles in 1961 under A&P's private label trademark "Sunnyfield." Until 1969, Nifty was the exclusive supplier of "Sunnyfield" waffles.

Pet entered the frozen waffle business in 1963. It tried to secure A&P's private label business, but had no success until 1969. In December 1968, Pet sent A&P a form letter announcing a limited duration advertising

allowance for private and packer label frozen waffles. On January 6, 1969, A&P called Pet requesting a frozen waffle price list. A&P indicated in late May that Pet would become co-supplier, with Nifty, of "Sunnyfield" waffles.

On July 2, Nifty received a letter from A&P stating that Nifty would no longer be supplying certain A&P warehouses with waffles. The letter referred to a conversation several months earlier at which Nifty had expressed concern that it might lose some of the A&P business.

Nifty placed a large order for "Sunnyfield" cartons sometime in July with its carton supplier, The Brown Company ("Brown"). Brown in turn ordered the board for the cartons. On August 22, 1969, A&P called Pet to ask for assistance in verifying whether Nifty had placed a large "Sunnyfield" order with Brown, and if so, whether the order could be canceled. Pet called Brown and learned that an order had been placed, but that the status of the Nifty contract was "unclear." The board was in transit, Brown reported, but it could still be used for other orders. A&P then warned Nifty, in a letter date August 27, 1969, that A&P would not be responsible for any cartons other than those which Nifty already had on hand.[1]

On October 10, A&P told Pet that it would become the sole supplier of "Sunnyfield" waffles effective November 15, 1969. Sometime after October 15, 1969, A&P bought all of Nifty's remaining inventory of "Sunnyfield" waffles. In March 1970, Nifty ceased doing business.

## II.

■ Count I of the complaint alleged that A&P and Nifty entered into an exclusive requirements contract for the sale of "Sunnyfield" waffles, and that this contract contained an implied term requiring A&P to give Nifty reasonable notice of termination. Nifty alleges that A&P breached this implied term when it terminated Nifty in 1969. The district court concluded that the alleged contract was unenforceable, and notice was therefore unnecessary, because under the then-applicable New York Statute of Frauds,[2] Sections 31 and 85 of the New York Personal Property Law, Nifty had

1. This will serve to confirm our directions to you to stop any printing of Sunnyfield Brand Frozen Waffle Cartons. You have stated that certain ones were in transit. We have determined that the facts are otherwise. We, therefore, hereby put you on notice that we shall in no way be responsible for any cartons in excess of one million which you previously reported that you had on hand.
Letter from A&P to Nifty, Joint App. at 383.

2. The complaint alleges that the agreement between A&P and Nifty was entered into in 1961. The applicable law is that which was in force at the time of the agreement. *Fredenburg v. Fredenburg,* 159 Misc. 525, 288 N.Y.S. 377, 380–81 (Sup.Ct.N.Y.Co.1936). In 1961, the Uniform Commercial Code had not yet been adopted in New York, and the relevant provisions of the Statute of Frauds were contained in Sections 31 and 85 of the New York Personal Property Law:

§ 31. *Agreements required to be in writing*
Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; . . ..

§ 85. *Statute of frauds governing contracts to sell goods and sales of goods*
1. A contract to sell or a sale of any goods of the value of five hundred dollars or upward, except where the goods are to be manufactured especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, shall not be enforceable by action unless:
(a) There is some note or memorandum in writing signed by the party to be charged or his agent in that behalf, sufficient to indicate that a contract to sell or a sale has been made between the parties and showing the quantity of goods sold or contracted to be sold; or
(b) The buyer has accepted part of the goods and actually received the same, or
(c) The buyer has given something in part payment.
2. A writing which otherwise satisfies paragraph (a) of subdivision one is not insufficient because it omits or incorrectly states a term agreed upon, but the contract is not enforceable under that paragraph beyond the quantity of goods shown in such writing.

failed to present sufficient written evidence of the contract. We conclude that the alleged contract was invalid under Section 31(1). By its terms the alleged contract could not have been performed within one year, and Nifty failed to present a writing satisfying the requirements of the section.[3]

A contract with a termination provision can be performed within one year if there is a possibility, however slight, that the termination can be unilaterally effected within one year. *North Shore Bottling Co. v. C. Schmidt & Sons*, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968). A termination provision must be express, however, in order to excuse a contract from the writing requirement of the Statute of Frauds. *Hausen v. Academy Printing & Specialty Co.*, 34 A.D.2d 792, 311 N.Y.S.2d 613 (2d Dept. 1970); *see also Cohen v. Bartgis Bros.*, 264 App.Div. 260, 35 N.Y.S.2d 206 (1st Dept. 1942). Nifty concedes that the termination provision here was only implied. The alleged contract could no more be performed within one year, therefore, than could a requirements contract without a termination provision. *See Shirley Polykoff Advertising, Inc. v. Houbigant*, 43 N.Y.2d 921, 403 N.Y.S.2d 732, 374 N.E.2d 625 (1978). Hence Nifty was required under Section 31(1) to present a writing evidencing the contract and "subscribed by the party to be charged therewith." At the time of the making of the alleged agreement, New York law also required that a writing purporting to evidence a contract for the sale of goods contain all the terms of the contract. *Poel v. Brunswick Balke-Collender Co.*, 216 N.Y. 310, 314, 110 N.E. 619 (1915).

Nowhere in the large file of correspondence which Nifty claims contains a memorandum of the contract is there a writing which meets these requirements. In particular, A&P did not sign the two letters which Nifty specifically cited as evidence of "the fact of agreement and many of the terms alleged." In short, Nifty presented no significant evidence that it entered into a long-term contract with A&P.

### III.

Count II asserts that A&P and Nifty developed a "confidential relationship" and that "Pet maliciously interfered with the agreement between Nifty and A&P and induced and caused A&P to breach the same by summarily terminating Nifty," which on its face seems to allege nothing more than inducement by Pet of breach of a contract which the district court correctly held to be unenforceable. If we give Nifty the benefit of every inference, however, Count II might also be read to charge that A&P violated a duty of care arising from an alleged non-contractual, confidential relationship with Nifty, and that Pet interfered with this relationship.

To the extent that Count II alleges that Pet tortiously interfered with the alleged contract between A&P and Nifty, it was correctly dismissed. An essential element of the tort of inducement of breach of contract is the existence of a valid contract. *See, e. g., Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956); *Wegman v. Dairylea Cooperative, Inc.*, 50 A.D.2d 108, 114, 376 N.Y.S.2d 728, 736 (4th Dept. 1975); *Red Wing Productions, Inc. v. American Broadcasting-Paramount Theatres, Inc.*, 213 N.Y.S.2d 315, 317 (Sup.Ct.N.Y.Co.1961). The contract here was unenforceable under the Statute of Frauds. Under New York law, a contract void under the Statute of Frauds was void for all purposes, including claims against third persons. *Dung v. Parker*, 52 N.Y. 494 (1873). This rule may have been relaxed to some degree.[4] Here, however, the existence of a valid contract is an ex-

---

3. We do not reach the question of whether the contract was also invalid under § 85.

4. *Compare Roberts v. Champion Int'l*, 52 A.D.2d 773, 382 N.Y.S.2d 790, 791 (1st Dept. 1976) *and Subirana v. Munds*, 257 App.Div. 956, 14 N.Y.S.2d 278 (1st Dept. 1939), *aff'd mem.*, 282 N.Y. 726, 26 N.E.2d 828 (1940) *with Kaminsky v. Abrams*, 51 Misc.2d 5, 272 N.Y.S.2d 530 (Sup.Ct.N.Y.Co.1965) *and Brockport Developers Inc. v. 47 Ely Corp.*, 82 Misc.2d 310, 369 N.Y.S.2d 601, 606 (Sup.Ct.Monroe Co. 1975).

plicit element of the cause of action. The plaintiff cannot rest his claim on a contract void under the Statute of Frauds, particularly where the term allegedly breached was only implied.[5]

■ To the extent that Count II alleges that Pet interfered with Nifty's "confidential relationship" with A&P, it was also correctly dismissed. The only relevant tort recognized under New York law is interference with advantageous business relations. *See generally, Beardsley v. Kilmer,* 236 N.Y. 80, 140 N.E. 203 (1923). This tort requires proof that the defendant's sole motive was to inflict injury and that the defendant employed unlawful means to do so. *Beardsley, supra,* 236 N.Y. at 86–89, 140 N.E. 203; *Rosenberg v. Del-Mar Division, Champion International Corp.,* 56 A.D.2d 576, 577, 391 N.Y.S.2d 452, 453 (2d Dept. 1977).

■ Pet was clearly acting in its interest as a seller of frozen waffles in attempting to become A&P's supplier. It was not motivated solely by a desire to inflict injury. Moreover, Nifty presented no evidence that Pet employed unlawful means in soliciting and acquiring the A&P business. Under New York law, "unlawful means" refers only to criminal or fraudulent conduct. *Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 400, 189 N.E. 463, 469 (1934) ("[T]he interference of a competitor creates no cause of action. The thing the law looks for and seeks to redress when found is fraud, deceit, false charges made against

the competitor"); *see also Sommer v. Kaufman,* 59 A.D.2d 843, 399 N.Y.S.2d 7 (1st Dept. 1977) (cause of action stated for interference with business relations where defendant allegedly bribed government officials).

■ To the extent that Count II charges A&P with violating a duty of care arising from a confidential relationship, it was also properly dismissed. The relationship of a buyer to his supplier, even if that buyer accounts for the large part of the supplier's business, does not constitute a fiduciary or other special relationship of trust imposing non-contractual duties on the buyer to continue buying goods or to give the supplier reasonable notice of termination. *See, e. g., Sachs v. Cluett, Peabody & Co.,* 265 App. Div. 497, 39 N.Y.S.2d 853 (1st Dept. 1943), *aff'd per curiam,* 291 N.Y. 772, 53 N.E.2d 241 (1944). Nifty was not the ward of A&P; A&P had no duty to insure Nifty's continuing prosperity.[6] "Parties dealing at arm's length, each seeking for himself the best advantage to be derived from a transaction, are not in confidential relationship." *Sachs, supra,* 39 N.Y.S.2d at 856.[7]

## IV.

Count III of the complaint charges that "Pet and A&P maliciously and wilfully interfered with the contract between Nifty and Brown and induced Brown to breach the contract." Count III was correctly dismissed; Brown did not breach its alleged contract with Nifty.

---

5. In *Brockport,* for example, an oral assignment of a warranty deed to the defendant was found to be void under the statute of frauds. Nevertheless, an action for breach of warranty was upheld where the plaintiff-vendor had acquiesced in the assignment by delivering the deed to the defendant and allowing the closing to take place in the defendant's name. There was no such estoppel in this case.

6. There was some indication that Nifty's financial difficulties began well before the events at issue here. In 1964, Nifty and its affiliated companies were debtors in possession subject to a Chapter XI proceeding. *In re Lustig Food Industries, Nifty Foods Corporation, et al.* (Bankruptcy No. 64–1082).

7. None of the cases cited by Nifty suggests anything to the contrary. *Albemarle Theatre, Inc. v. Bayberry Realty Corp.,* 27 A.D.2d 172, 277 N.Y.S.2d 505 (1st Dept. 1967) involved a deliberate attempt by the defendant to destroy the accumulated goodwill of plaintiff's theatre by leasing it and showing second-rate movies in order to increase his revenues from other theatres. In *Schisgall v. Fairchild,* 207 Misc. 224, 137 N.Y.S.2d 312 (Sup.Ct.N.Y.Co.1955), plaintiff granted the defendant the right to publish his book in return for royalties, and defendant withdrew the book from sale after it had been printed and orders had been received. Both of these cases involved the deliberate and unjustifiable destruction of a property right entrusted under a contract; such is not the case here.

In his deposition, a Brown employee testified that Brown would order carton board when it received an order from Nifty, but would not sheet, print, and die cut the board until a fifty percent advance payment was received. The board took three or four weeks to arrive.

Nifty never made the advance payment on the July order. As of August 22, the date of the A&P and Pet phone calls, the board was still in transit. Brown kept the board in inventory ("sat on the board") for eight or nine weeks before using it to fill other orders. A letter from Brown to Nifty dated October 20, 1969 describes the board as no longer in inventory.

The uncontroverted evidence shows that Brown held the board for Nifty long after it received the phone calls from A&P and Pet on August 22. Moreover, Brown stated point blank that neither Pet nor A&P influenced it to cancel the carton contract.

Proof of breach is an essential element of inducement of breach. *Israel v. Wood Dolson Co., supra,* 1 N.Y.2d at 120, 151 N.Y. S.2d 1, 134 N.E.2d 97. The breach induced cannot be that of the plaintiff himself. Brown did not breach the contract by using the board for other purposes, because Nifty never performed the condition precedent to the printing of the cartons: payment of the first fifty percent of the purchase price. The only "inducement" which took place, if any, was A&P's inducement of Nifty not to print any additional cartons.[8]

Nifty presented no evidence to support an anticipatory repudiation by Brown. *See* N.Y.U.C.C. § 2–610 (McKinney 1964) and Official Comments; *see also In re R. Hoe & Co., Inc.,* 508 F.2d 1126 (2d Cir. 1974). There is no evidence that Nifty demanded the cartons, or that Brown said it would not supply cartons upon receipt of the advance payment.[9]

V.

In Counts IV and V, Nifty contends that Pet monopolized a putative private label frozen waffle submarket and attempted to monopolize the entire frozen waffle market.[10] Counts IV and V also charge that Pet and A&P conspired to monopolize both markets, and to drive Nifty out of business, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976).

Summary judgment for the defendants can be sustained in this case if this court "is satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor and subjecting defendant's evidence to a critical eye could not rationally have found that plaintiff was entitled to any relief." *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 611, (2d Cir. 1979); *see also United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1972) (per curiam). Because Pet and A&P have presented evidence contradicting Nifty's allegations, Nifty cannot rest on its pleadings, and must present some significant probative evidence in support of its complaint. Fed.R.Civ.P. 56(e); *First National Bank of Arizona v. Cities Service Co.,* 391

---

8. Moreover, even if facts supporting a causal connection between the phone calls and the decision by Brown had been advanced, Nifty would not have stated a cause of action for inducement. Pet and A&P merely informed Brown that Pet was going to be the new supplier of "Sunnyfield" waffles. Mere recitation of existing facts apparently does not constitute "inducement" for purposes of the tort of inducement of breach of contract. See W. Prosser, *Law of Torts* 934–35 (4th ed. 1971) and cases cited therein.

9. Under New York law, an essential element of a cause of action for inducement of breach is full performance by the plaintiff of his obliga-

tions under the contract. *Hornstein v. Podwitz,* 254 N.Y. 443, 449, 173 N.E. 674, 675 (1930) ("The complaint herein contains, as amended, all of the essential allegations necessary in a complaint to recover damages for wrongfully inducing a breach of contract. It sets forth the contract and the fact that the plaintiff had fully performed . . . ."); *see also Gross v. Gross,* 31 Misc.2d 934, 221 N.Y. S.2d 785, 787–88 (Sup.Ct.Kings Co.1961).

10. On appeal, Nifty has abandoned its contention that Pet monopolized the entire waffle market.

U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). This Nifty has failed to do.

## A. The Relevant Product Market

■ Proof of the relevant product market is a necessary element of a cause of action for monopolization or attempted monopolization. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Nifty bears the burden of proving the boundaries of the relevant market. *United States v. E. I. Du Pont de Nemours & Co.,* 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956).

■ Goods are in the same relevant product market if they are "reasonabl[y] interchangeab[le] for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. Du Pont de Nemours, supra,* 351 U.S. at 404, 76 S.Ct. at 1012 (product market determined to be not only cellophane, but all flexible packaging materials).

■ Nifty concedes that there is no qualitative difference between brand name waffles and private label waffles. It is undisputed that Nifty and Pet each manufactured its private label waffles in the same plant, from the same formula, and by the same process as its brand name waffles. Nifty claims that two relevant submarkets are created by virtue of the higher cost of brand name waffles.[11]

In *Brown Shoe Co. v. United States,* 370 U.S. 294, 325–26, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962), the government challenged a proposed merger[12] between Brown Shoe and another shoe company on the grounds that it would create a risk of monopolization and adversely affect competition. Brown Shoe contended that the two companies competed in different product markets: medium-priced shoes and low-priced shoes. The Court rejected this argument, holding that the district court had properly found that the division of product lines based on "price/quality" was "unrealistic." *Id.* at 326, 82 S.Ct. at 1524. It is even less realistic to make such division in this case, where the two types of waffles are sold side by side in the same frozen food cases and distinguished only by label and price, and not quality.[13]

11. Nifty also argued that its claimed submarket definition is supported by evidence of lack of sensitivity of demand for brand name waffles to price changes in private label waffles, industry recognition, and the existence of distinct customers.

In support of its claim that changes in the price of private label waffles had no effect on the demand for brand name waffles, Nifty merely states that Pet increased its private label prices and made a profit. This implies nothing about demand for brand name waffles.

The industry trade reports cited by Nifty are, if anything, evidence for the broad market definition. Market share figures are given for each brand, for private label waffles and for packer label waffles. The two types of labels and the individual brands are thus treated similarly.

Finally, the fact that private label waffles are sold only to large volume wholesale customers does not imply separate product markets; private label and brand name waffles compete directly at the retail level.

12. *Brown Shoe* was an action brought under Section 7 of the Clayton Act, 15 U.S.C. § 18, but a "line of commerce" for purposes of the Clayton Act is equivalent to a "part of commerce" for purposes of the Sherman Act. *United States v. Grinnell Corp.,* 384 U.S. 563, 575, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966).

13. *See Liggett & Myers, Inc. v. FTC,* 567 F.2d 1273 (4th Cir. 1977) (relevant dog food market includes both "premium" and lower quality "economy" canned dog food); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (relevant market is not limited to pipeless recirculation systems for public swimming pools but rather includes all recirculation systems for public pools); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237 (8th Cir. 1973) (relevant market includes a number of aluminum alloys, not only particular high-quality aluminum-beryllium alloy); *United States v. Jos. Schlitz Brewing Co.,* 253 F.Supp. 129 (N.D. Cal.), *aff'd per curiam,* 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35, *reh. denied,* 385 U.S. 1021, 87 S.Ct. 702, 17 L.Ed.2d 560 (1966) (private label and "premium" beer are part of the same relevant market).

Nifty's claims of monopolization therefore must be based on a product market that includes both private label and brand name frozen waffles. As such, the claims were correctly dismissed. When Pet began supplying A&P with private label waffles, Pet's share of the market was 48.3%. Its share declined continuously thereafter, and by 1974 was only 33%. These estimates of market share are not sufficient evidence to make out a claim of unlawful monopolization. *See, e. g., United States v. Aluminum Company of America,* 148 F.2d 416, 424 (2d Cir. 1945); *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 346 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

## B.  Attempted Monopolization

The essential elements of attempted monopolization under Section 2 of the Sherman Act are (1) a "dangerous probability of success" in monopolizing a given product market and (2) a specific intent to "destroy competition or build monopoly." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *FLM Collision Parts, Inc. v. Ford Motor Co., supra,* 543 F.2d at 1030. Because we hold that Nifty failed to establish a "dangerous probability of success" as a matter of law, we need not consider the question of Pet's intent.

Pet's market share figures are the only evidence Nifty puts forward in support of its claim that Pet had such a dangerous probability of success. No reasonable jury could conclude from the rapid and continuous decline of Pet's market share, which reached a high point of 54.5% in March 1969 and fell to 33% by 1974, that there was a probability that Pet would monopolize the

waffle market, let alone a dangerous probability.  *See United States v. Empire Gas Corp.,* 537 F.2d 296, 305–07 (8th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (proof of 50% market share alone is not sufficient to show a dangerous probability of success); *Diamond International Corp. v. Walterhoefer,* 289 F.Supp. 550, 578 (D.Md.1968); *see also Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 60 (2d Cir. 1979).

## C.  Conspiracy

Counts IV and V also allege a conspiracy between Pet and A&P in violation of the Sherman Act, specifically, that A&P and Pet conspired to bring about Nifty's alleged "abrupt termination without notice," and that Pet made a discriminatory offer to A&P in order to obtain the private label account. Nifty asserts that A&P and Pet jointly interfered in Nifty's contract for cartons with the Brown Company, and that this was evidence of "knowing collusion" between the defendants.

The undisputed facts, however, show only that A&P, acting alone and with ample justification based on continued problems with the quality of Nifty's waffles, decided to replace Nifty with Pet as its supplier of "Sunnyfield" waffles. A termination of this type is not a *per se* violation of the antitrust laws; the fact that an agreement between the buyer and the new supplier is necessarily involved does not make it an illegal conspiracy. *United States v. Colgate,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Fuchs Sugar & Syrups v. Amstar Corp.,* 602 F.2d 1025 (2d Cir. 1979); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir. 1969).[14]  This is as true of refusal to deal with sellers by buyers as it is of buyers by sellers.  *See Pastor v. Ameri-*

---

14.  "[T]he decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before

the seller terminates his dealings with A." *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir. 1969).

*can Telephone & Telegraph Co.,* 76 F.Supp. 781 (S.D.N.Y.1940).

Nifty presented no significant probative evidence to controvert Pet's sworn statements and other evidence that it did not offer waffles to A&P on discriminatory or predatory terms [15] and that it neither suggested nor was involved in the termination of Nifty. The calls by Pet and A&P to Brown to inquire about the status of Nifty's carton order were made pursuant to a lawful change in suppliers, and are not significant probative evidence of a conspiracy to violate the antitrust laws.

Even if Nifty was injured by its termination, this alone does not convert A&P's decision into a violation of the antitrust laws. *See Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir. 1978) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338, *reh. denied,* 439 U.S. 1104, 99 S.Ct. 883, 59 L.Ed.2d 65 (1978).

## VI.

Counts VI and VII incorporate and reallege parts of Counts IV and V as a common law tort of unfair competition. Nifty has not stated a cause of action for unfair competition under New York law, and these counts were properly dismissed by the district court.

Claims for unfair competition in New York have traditionally involved passing off or malicious and fraudulent interference with good will. *See, e. g., David B. Findlay, Inc. v. Findlay,* 18 N.Y.2d 12, 271 N.Y.S.2d 652, 218 N.E.2d 531, *cert. denied,* 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966). The tort originated as a supplement to the tort of trademark infringement. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Although New York courts have not entirely restricted unfair competition to cases of passing off, the allegations of Counts IV and V have never formed the basis of such a tort. None of the New York cases cited by Nifty involves conduct even remotely similar to the conduct of the parties here.[16]

The judgment dismissing the action is affirmed.

---

15. Under Pet's system of advertising allowances, a payment would be made (typically $.20 per case of forty-eight cartons) to customers who submitted proof that they had advertised private label frozen waffles during a specified period. Affidavit of Alfred Preate, Joint App. at 33. Pet also gave quantity discounts. A large customer such as A&P, which already was carrying many Pet frozen foods, could obtain an additional line of Pet frozen foods such as waffles at a substantial savings ($.04 to $.08 per dozen in the case of A&P). Joint App. at 41.

16. *Gardenia Flowers, Inc. v. Joseph Markovits, Inc.,* 280 F.Supp. 776 (S.D.N.Y.1968), involved elements of passing off. The plaintiff charged that the defendant induced a third party to cease supplying the plaintiff with corsages and instead to sell corsages bearing defendant's label but made from plaintiff's molds to the defendant for resale to customers so as to deceive customers as to origin. In *Union Car Advertising Co. v. Collier,* 232 App.Div. 591, 251 N.Y.S. 153 (1st Dept. 1931), defendant was charged with maliciously and fraudulently preventing the plaintiff from entering into a contract with a third party. *Madison Square Garden Corp. v. Universal Pictures Co.,* 255 App.Div. 459, 7 N.Y.S.2d 845 (1st Dept. 1938), involved the passing off of a motion picture as representing plaintiff's hockey arena when it in fact did not. *Mead Johnson & Co. v. G–E–X Inc. of Albany,* 37 Misc.2d 491, 235 N.Y.S.2d 951 (Sup.Ct.Albany Co.1963), involved statutory unfair competition for underselling in violation of a fair trade agreement under former Section 369–b of the New York General Business Law. *Metropolitan Opera Association v. Wagner-Nichols Record Co.,* 199 Misc. 786, 101 N.Y.S.2d 483 (Sup. Ct.N.Y.Co.1950), *aff'd.* 279 App.Div. 632, 107 N.Y.S.2d 795 (1st Dept. 1951), involved charges of selling unauthorized recordings of the Metropolitan Opera's radio broadcasts.