JENNINGS OIL COMPANY, INC., et al., Plaintiff,

v.

MOBIL OIL CORPORATION, Defendant.

No. 77 Civ. 1398 (HFW).

United States District Court, S. D. New York.

May 21, 1982.

---

action accrued, it would be barred under even this more generous rule.

3. This was changed when Missouri enacted the Uniform Arbitration Act, § 435.350–435.470, R.S.Mo., which provides at § 435.405.2 that applications to vacate an award must be made within ninety days after delivery of a copy of the award to the applicant. This provision does not control here, however, because the Act expressly provides that it applies only to agreements made subsequent to its effective date, August 13, 1980. § 435.445, R.S.Mo. The collective bargaining agreement in this case took effect on December 21, 1978 and expired on February 28, 1982.

4. Plaintiff alleges in this complaint the District 9 decided not to press arbitration until the criminal charges against him arising from his altercation with Hedkamp were resolved. Assuming, arguendo, that this is true, and assuming that this tolled the statute of limitations, plaintiff's complaint would nevertheless be time-barred. Plaintiff was acquitted of the criminal charges in July of 1981. District 9 asked Anheuser Busch to reinstate plaintiff on October 1, 1981, and this request was denied on October 2, 1981. Plaintiff should then have filed suit prior to commencement of the next term of the circuit court, which would have been the second Monday of November, 1981. He did not.

Berger & Montague, P.C., Philadelphia, Pa. (David Berger, Warren D. Mulloy, Howard Langer, Philadelphia, Pa., of counsel), Bassman, Mitchell & Levy, Alexandria, Va. (Richard Levy, Alexandria, Va., of counsel), Olnick, Seltzer & Boxer, New York City (Donald A. Derfner, New York City, of counsel), for plaintiffs.

Donovan, Leisure, Newton & Irvine, New York City (Sanford M. Litvack, John H. Wilkinson, New York City, of counsel), for defendant.

## OPINION

WERKER, District Judge.

Defendant Mobil Oil Corporation ("Mobil") moves for summary judgment pursuant to Fed.R.Civ.P. 56 as to Counts II and III of the amended complaint. Mobil also seeks decertification of the class on Count III. Plaintiffs have cross-moved for summary judgment on Count III of the amended complaint.

The background of this case is set forth in the Court's opinion conditionally certifying the action as a class action, *see Jennings Oil Co. v. Mobil Oil Corp.,* 80 F.R.D. 124 (S.D.N.Y.1978), and in the opinion denying Mobil's motion for judgment on the pleadings as to Count II of the amended complaint and granting in part and denying in part Mobil's motion to dismiss Count III of the amended complaint. *See Jennings Oil Co. v. Mobil Oil Corp.,* No. 77 Civ. 1398 (S.D.N.Y. Aug. 23, 1979). Reader familiarity with those opinions is assumed.

## COUNT II

Count II of the amended complaint charges Mobil with violating section two of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to monopolize the sale and distribution of Mobil products to Mobil branded retail service stations. Plaintiffs allege that Mobil's actions in March, 1973, of allocating gasoline to its distributors and raising distributor prices without taking the same action with respect to service stations supplied directly by Mobil, "squeezed" Mobil branded distributors and curtailed their ability to compete with Mobil in sales to retail service stations. Plaintiffs argue that by these actions Mobil monopolized the production and distribution of Mobil gasoline, in violation of section 2 of the Sherman Act. According to plaintiffs, Mobil gasoline constitutes a relevant market for Section 2 purposes.

Mobil contends that three critical factual elements of a claim under § 2 are absent in this case. They are:

(a) the existence of competition between Mobil and its gasoline distributors in the sale of Mobil branded gasoline to Mobil service stations;

(b) the existence of injury to plaintiffs within the meaning of Section 4 of the Clayton Act; and

(c) the existence of a relevant market confined to the distribution of Mobil gasoline.

## COMPETITION BETWEEN PLAINTIFFS AND MOBIL

Mobil contends that there is no competition between it and plaintiffs and therefore, one of the essential elements of a section 2 violation is absent. Viewed in the light most favorable to plaintiffs, however, the evidence adduced thus far is sufficient to raise genuine issues of material fact as to whether plaintiffs compete with Mobil in the sale of Mobil gasoline to retail service stations.

Although it appears that plaintiffs and Mobil do not supply the same retailers as a result of the geographic allocation of markets by Mobil, there is evidence that retailers supplied by the branded distributors compete with retailers supplied directly by Mobil. The competition appears to occur primarily between distributor-supplied suburban retailers and Mobil-supplied urban retailers who must compete for sales to customers travelling between the two areas. There is further evidence that the retailers supplied by Mobil were able to sell gasoline at prices lower than those charged by the retailers supplied by branded distributors. This situation allegedly existed because prices charged to retailers by Mobil were lower than those charged to retailers supplied by the distributors as a result of Mobil's increase in the distributor tank-wagon price. Consequently, it would appear that the branded distributors, in order to enable their retailers to effectively compete with retailers supplied by Mobil were engaged or may have been required to engage in price competition with Mobil in the supply of gasoline to retailers of Mobil branded gasoline.

## RELEVANT MARKET

 To prevail on a monopolization claim, a plaintiff must establish the possession of monopoly power and the willful acquisition or maintenance of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). To prevail on an attempted monopolization claim, a plaintiff must prove specific intent to monopolize and the dangerous probability of success in monopolizing a given product market. *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (1980). "Proof of relevant product market is a necessary element of a cause of action for monopolization or attempted monopolization." *Id.* at 840.

Plaintiffs contend that the relevant market in this case is Mobil gasoline and accessories. They argue that the provisions of Mobil's Wholesale Distributor Agreement demonstrate that distributors were substantially restricted contractually to selling gas-

oline purchased from Mobil to outlets carrying the Mobil brand, that petroleum allocation regulations codified at 10 C.F.R. § 211.9(a)(2)(1) curtailed plaintiffs' access to alternative sources of petroleum products, that even prior to the implementation of these regulations, "most major oil companies had adopted policies refusing to take on new distributor business on or about March, 1973," that one of the plaintiffs was unable to obtain an alternative source of supply, that Mobil refused to release one of the plaintiffs who did find another supplier, and that Mobil conceded that its distributors were locked-in to their present suppliers by the allocation regulations.

Mobil argues that the relevant product market may not be limited to Mobil gasoline and accessories because (a) there is no competition between Mobil and its distributors; (b) plaintiffs had access to alternative sources of supply; and (c) Mobil distributors compete with distributors of other companies. To support its contentions, Mobil has cited to portions of the depositions of the named plaintiffs in which they admit that during periods of shortage or when the price was cheaper they purchased gasoline from suppliers other than Mobil, that branded retailers of Mobil gasoline were at times supplied with gasoline other than Mobil gasoline, that they did not compete with Mobil for the same customers, and that the primary area of competition in the wholesale distribution of Mobil gasoline derived from competition with distributors of other brands of gasoline.

Summary judgment for the defendants is proper only if "giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor and subjecting defendant's evidence to a critical eye" it may be concluded that a jury "could not rationally have found that plaintiff was entitled to any relief." *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d at 839. Where the defendant has presented evidence contradicting plaintiffs' allegations, plaintiffs cannot rest on their pleadings, and must present some significant probative evidence in support of its claims. *Id.*

As previously discussed, plaintiffs have introduced sufficient evidence to render the issue of whether they compete with Mobil a genuine issue of material fact.

After reviewing the documents and depositions relied upon by plaintiffs and defendant on the issue of relevant market, I find that there are genuine issues of material fact which preclude determination of the relevant market as a matter of law. The disputed facts relate primarily to the availability of alternative supplies of gasoline and as a result, the nature of competition during the time period at issue in this suit. *Compare* Plaintiff's Exs. D–F, I–O, Q–R *with* Defendant's Exs. Oliver, C. Jennings, L. Jennings, Jackson.

The conclusion that genuine issues of material fact preclude a finding as to relevant market as a matter of law is not unexpected. It frequently has been observed that "[a] pronouncement as to market definition is not one of law, but of fact . . . ." *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir. 1978), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); see *Sulmeyer v. Seven-Up Corp.*, 411 F.Supp. 635, 643 (S.D. N.Y.1976).

### ECONOMIC INJURY

Mobil's next contention is that the undisputed evidence shows that plaintiffs cannot establish that the acts of which they complain impacted on them or threatened the survival of their businesses. The foundation of this assertion is that the distributors passed-on Mobil's price increase to their purchasers and therefore did not sustain a loss. Mobil further contends that the evidence shows that plaintiffs actually increased their margins and profits during the time period which is the subject of this suit. It also argues that the percentage of Mobil's total Marketing Department sales of automotive gasoline accounted for by sales to Mobil distributors increased from 18.6% in 1972 to 26.4% in 1978.

Mobil's contentions in support of summary judgment must be rejected. It is

well-settled that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a *prima facie* case of injury and damage" under the antitrust laws. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 2228, 20 L.Ed.2d 1231 (1968). Hence, even though a plaintiff may have avoided loss by passing on the overcharge, or by reducing his other costs or increasing his volume, he is still entitled to damages, for "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows." "[H]ad the price paid been lower, his profits would have been higher." *Id.* Thus, the fact that plaintiffs' profits and market shares may have increased during the period at issue in this suit is not decisive. *See* L. Sullivan, *Handbook of the Law of Antitrust* § 252 at 789–90 (1977).

█ Consequently, although it has not yet been determined that Mobil's action of reducing the discount for the independent Mobil distributors at the same time that the tank-wagon price of gasoline sold directly to service station operators remained constant was illegal, defendant is not entitled to judgment as a matter of law based upon the evidence of economic impact adduced thus far. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. at 489, 88 S.Ct. at 2228; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297–98 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).[1]

### COUNT III

█ Count III of the amended complaint charges Mobil with violating the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (the "ESA"), as amended and incorporated in the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751 *et seq.* (the

"EPAA"), by violating various regulations promulgated thereunder. Those regulations are Cost of Living Council Special Rule No. 1, 38 Fed.Reg. 6284 (1973), and 10 C.F.R. §§ 210–212.

Plaintiffs have moved for summary judgment on Count III. In the alternative, plaintiffs seek a ruling that they have established a *prima facie* case on the issue of violation of the class of purchaser provision of Special Rule No. 1 and a reference to a United States Magistrate or Special Master for reclassification of Mobil's purchasers and a determination of the amount of any overcharges.

Mobil has cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56 on Count III of the amended complaint. Alternatively, Mobil seeks decertification of the class with respect to plaintiffs' Count III claim for actual damages.

Plaintiffs seek damages for a three year period commencing March 22, 1974. *See Jennings Oil Co. v. Mobil Oil Corp.*, No. 77 Civ. 1398 (S.D.N.Y. Aug. 23, 1979). During that period, Mobil's prices were governed by Cost of Living Council Phase IV regulations. *See* 38 Fed.Reg. 22536 (Aug. 19, 1973). Under the Phase IV regulations, refiners were required to compute base prices using "the weighted average May 15, 1973 selling price for a particular product." *Mobil Oil Corp. v. Department of Energy*, Em.App., 678 F.2d 1083 at 1084 (1982). Plaintiffs argue that they are entitled to damages under Phase IV because Mobil's May 15, 1973 selling prices were illegal under Special Rule No. 1, the price rule in effect on May 15, 1973.

Mobil argues that plaintiffs' claims under Special Rule No. 1 must fail for the reasons that (1) Special Rule No. 1 was rendered inoperative by the adoption of superseding regulations in August 1973, five months prior to the end of the Rule's control year

---

[1] While "a purchaser may *recover* only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct," *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct.

1061, 62 L.Ed.2d 783 (1980), this is an issue of damages which will involve the calculation of the excess cost to plaintiffs resulting from Mobil's purportedly illegal conduct. It is evident that resolution of such an issue must await trial.

and thus, five months before the time at which a violation of the Rule could occur or be measured; and (2) to the extent compliance could be measured during the few months the Rule was in effect, Mobil's May 15, 1973 prices to distributors complied with the rule.

Special Rule No. 1, promulgated on March 8, 1973, pursuant to 6 C.F.R. Chapter 130, Subpart K, Cost of Living Council Phase III Regulations, "establishe[d] mandatory rules governing price adjustments for the sale of crude petroleum and petroleum products." Special Rule No. 1, ¶ 1, 38 Fed.Reg. 6283 (March 8, 1973). Under the rule, a firm could not "increase the price for a covered product above its base price *if the increase would result in a weighted annual average price increase for the control year for the firm's covered products* of more than 1 percent above base prices." *Id.* at ¶ 4. The "control year" was defined as "the year beginning January 11, 1973, and ending January 10, 1974." *Id.* at ¶ 2. "Base price" was determined by reference to prices or rules in effect on January 10, 1973. Special Rule No. 1, as amended, ¶¶ 2(a)–(c), 38 Fed.Reg. 12607 (May 14, 1973).

According to Mobil, until the control year expired on January 10, 1974, and actual sales results for all covered products were accounted for, a weighted annual average price increase for the year could not finally be calculated, and a violation of the 1% limit by any one or more price increases during that year could not be determined. Five months before the conclusion of the control year, however, the Cost of Living Council added Subpart L—Petroleum and Petroleum Products—to the Phase IV regulations promulgated on August 9, 1973, 38 Fed.Reg. 22536 (Aug. 19, 1973), and thereby precluded completion of the control year under the regulatory scheme set forth in Special Rule No. 1.

Section 150.1(a) of the Cost of Living Council Phase IV Price Regulations specifically provides that "this part supersedes the price rules in Parts 130 and 140 of this chapter, effective 11:59 p. m., e. s. t. August 12, 1973." 38 Fed.Reg. 21597 (Aug. 9, 1973).

As noted above, Special Rule No. 1 was promulgated pursuant to subpart K of Part 130.

As recently stated by the Temporary Emergency Court of Appeals:

Separate mandatory price controls for petroleum and petroleum products were first implemented under Phase IV regulations adopted by the Cost of Living Council (CLC) on August 19, 1973, under authority of section 203(a)(1) of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904 note. The price rules provided, inter alia, that a refiner could charge the weighted average May 15, 1973 selling price for a particular product, plus increases to reflect increased product (crude oil) and nonproduct (marketing and operating) costs incurred since May, 1973. 6 C.F.R. § 150.355 (1974).

In order to determine the maximum lawful price for each refined product, it was necessary to develop a regulatory mechanism which allocated the total increased crude oil costs among the various products. Volumetric apportionment, i.e., the "V factor", was adopted, which established for each product a fraction of the increased crude oil costs which the refiner could pass on to a particular product or product category. The numerator of the fraction was the total volume of the covered product or product category sold in a specified time period. The denominator was the total volume of all covered products sold in the same period.

The CLC cost apportionment regulations covered both "special products" (gasoline, No. 2 diesel fuel and No. 2 heating oil) and all other products, referred to collectively as "covered products other than special products." Thus, all refined crude oil products were regulated under the ESA.

The regulations specifically prohibited refiners from allocating any costs volumetrically attributable to "covered products other than special products" to "special products." Each "special product" could bear only its volumetrically proportionate share of crude oil costs. 6 C.F.R.

§ 356(c)(1)(i) (1974). Among "covered products other than special products," however, costs could be apportioned to whichever of those products the refiner deemed appropriate. 6 C.F.R. § 150.-356(c)(1)(ii) (1974).

*Mobil Oil Corp. v. Department of Energy,* 678 F.2d at 1084 (Em.App.1982); *see Standard Oil Co. v. Department of Energy,* 453 F.Supp. 203 (N.D.Ohio 1978), *aff'd,* 596 F.2d 1029 (Em.App.1979).

Based on the foregoing, it is clear that the manner in which Mobil was required to proceed under Special Rule No. 1 of Phase III was altered with the implementation of a different regulatory scheme in Phase IV. The primary differences between the two schemes are that under Special Rule No. 1 no distinction was made between covered products and special products and prices for any particular product could not be increased if the increase would result in a weighted annual average price increase for all covered products of more than 1 percent above base prices. Under Phase IV, on the other hand, price increases for special products were tied to the special products' volumetrically proportionate share of crude oil costs. Moreover, under Phase IV, price increases were tied to cost justification and the weighted average was measured by fiscal quarter rather than by "control year." *See* § 150.358(d)(2).

Furthermore, under section 150.1(c) of the Phase IV regulations, the only reports due under Special Rule No. 1 which still were required to be filed on or after August 13, 1973, were reports for reporting periods which ended on or before August 12, 1973.[2] Thus, once Phase IV went into effect, reports for quarters ended after August 12, 1973 did not have to be filed. In the absence of such reports, it would appear that the weighted annual average price increase for the control year January 11, 1973 to January 10, 1974 cannot be computed.

Since the weighted annual average price increase for the control year cannot be computed, whether a specific price increase resulted in a violation of the 1 percent limit cannot be calculated. Thus, it cannot be determined if the prices charged by Mobil on May 15, 1973 were legal or illegal under Special Rule No. 1. Rather, the most that can be determined is that Mobil's prices on May 15, 1973 were in "apparent" compliance or "apparent" non-compliance with the rule on May 15, 1973. A violation of law, however, cannot be premised on so tenuous a finding as "apparent" noncompliance or "apparent" illegality.

Plaintiffs contend that Mobil was required to comply with Special Rule No. 1 in each of its fiscal quarters and that Mobil can be found to have violated the rule if its prices at the end of any fiscal quarter exceeded base prices by one percent. The language of Special Rule No. 1 plainly measures compliance in terms of the control year, however, and the introductory comments to the Rule indicate that a violation could be assessed only at the conclusion of the control year. The introduction to Special Rule No. 1 by James W. McLane, Deputy Director, Cost of Living Council, states:

> The hearings conducted by the Council clearly brought out the need for actions to assure adequate supplies of gasoline as well as home heating oil in the months immediately ahead. Seasonal demand fluctuations are likely to create pressures on gasoline supplies, and hence upon current gasoline prices, during the summer months. A special rule governing the prices of these products should provide companies with greater certainty on their pricing obligations under the Economic Stabilization Program and should help them in their planning process and in making the wide range of business decisions needed to increase domestic supply.

38 Fed.Reg. 6284 (March 8, 1973). In addition, monthly reports setting forth posted price movements, cost increases, and supply conditions were required to be filed under the rule. *Id.* at ¶ 6(b).

**2.** Quarterly reports setting forth "cost increases, profit margin, supply conditions, and a computation of [the firm's] weighted average annual price increase for prices increased above base price" were required to be filed under Special Rule No. 1. Special Rule No. 1, ¶ 6(c),

*Special rules which recognize the need for flexibility in individual prices to meet seasonal demand fluctuations should also help assure adequate supplies in circumstances where, as here, current prices are below base, but seasonal fluctuations and demand-supply factors may bring about increases above base. . . .*

38 Fed.Reg. 6284 (March 8, 1973) (emphasis added). Similarly, the introductory comments to the May 14, 1973 amendments to Special Rule No. 1, 38 Fed.Reg. 12607 (May 14, 1973) state:

The computation of weighted annual average price increase is based upon total volume sold between January 11, 1973, and the date on which the average is being computed. *If for one fiscal quarter the aggregate price increase computed is less than 1 percent, the difference between the increase computed and 1 percent may not be lost to the extent it may be accounted for by volume in the next calendar quarter.*

*Id.* (emphasis added).

Thus, particular calendar quarters in which prices might be less than or might exceed 1% of base prices clearly were contemplated by the Council. A violation of the rule could not be predicated on the prices charged in any one or more quarters prior to the conclusion of the control year, however, since a weighted annual average price increase of more than 1% above base in prior fiscal quarters might be reduced below base in subsequent fiscal quarters during the control year.[3]

3. As Mobil has noted:

It is particularly important to look at the entire control year since sellers had discretion under the Rule to allocate price increases among covered products and among customers any way they wished. 38 Fed.Reg. 6284 (March 8, 1973); 38 Fed.Reg. 12607 (May 14, 1973). As a result, a price increase for one product might be offset by a later price decrease for the same or another product. Or a large price increase to one group of customers, who purchased a small volume of product in the control year, might have no more impact than a small increase to another group, who purchased a large volume of product. Therefore, during the course of the control year, a seller could do no more than estimate, based on sales expectations, what

Although the second comment quoted above evinces an intent to monitor prices on a quarterly basis,[4] there is no evidence that a violation of Special Rule No. 1 could be predicated on the weighted average price charged on a particular day simply because that particular price exceeded base prices by one percent as of that day. Rather, only if that particular price increase resulted in a weighted annual average price increase for the control year for the firm's covered products of more than 1 percent above base prices could a violation of Special Rule No. 1 be established.

Thus, plaintiffs' argument that Mobil was in violation of Special Rule No. 1 on May 15, 1973 cannot withstand scrutiny. As a result, plaintiffs' theory of liability under Count III, which is premised on the illegality under Special Rule No. 1 of the prices charged by Mobil on May 15, 1973, must fail.

In view of the specific evidence concerning the manner in which Special Rule No. 1 was to be applied, plaintiff's arguments with respect to the application during Phase III of the general policies and principles of Phase II at pages 24–32 of their Reply Memorandum in Opposition to Mobil's Motion for Summary Judgment as to Count III are unconvincing.

Plaintiffs also contend that Mobil has overlooked § 150.15 of Phase IV in arguing that the Phase IV regulations superseded Special Rule No. 1 of Phase III. Section 150.15 provides:

the impact of a particular price increase might be on its weighted annual average increase. Only after January 10, 1974 could the seller, or anyone, determine the actual, final impact of its pricing actions under the Rule.

Defendant's Memorandum in Support of Motion For Summary Judgment as to Count III, pp. 5–6.

4. To the extent that the comments with respect to monitoring of prices on a quarterly basis conflict with the language of ¶ 4(c) of the Rule, if at all, the language of the Rule which is phrased in terms of "control year" would prevail. *See generally Pennzoil Co. v. Department of Energy,* 680 F.2d 156 at 173, n.27 (Em.App. 1982).

Nothing in this part shall be construed as waiving or foreclosing the right of the council pursuant to Subpart J of Part 130 of this Chapter to challenge Phase III price increases, whether charged or contracted for; or the right to seek or impose sanctions, remedial orders, or other relief pursuant to Subparts E, F, or G of Part 140 of this Chapter with respect to Phase III freeze matters.

Plaintiffs' reliance on § 150.15 of Phase IV is misplaced. Reservation of the right in the Council to impose sanctions for violation of the provisions of sections 130 and 140 which regulated a wide range of businesses and industries cannot provide a basis for establishing that the drafters of Special Rule No. 1 contemplated that a firm could be found in violation of the rule at the end of a particular fiscal quarter or on the basis of any particular price increase. Rather, it first must be determined that the drafters intended to impose liability under the rule on the basis of a daily or quarterly weighted average price increase of more than 1% above base. As discussed above, it does not appear that a violation of Special Rule No. 1 could be predicated on the weighted average price charged on a particular day or in a particular fiscal quarter until the weighted annual average price increase for the firm's covered products was calculated at the conclusion of the control year.

Finally, plaintiffs' argument that Mobil violated the class of purchaser provisions of Part 130 and consequently utilized inaccurate base prices under Special Rule No. 1 is unavailing. Even if Mobil violated the class of purchaser provisions, and would have been required to redefine its classes and recompute its base prices for purposes of Special Rule No. 1, it does not appear that a violation of the rule on the basis of any particular price increase could have been determined until the end of the control year on January 10, 1974. Since different price rules were put into effect before the end of the control year, that determination cannot be made.

## CONCLUSION

In accordance with the above, Mobil's motion for summary judgment as to Count II is denied. Plaintiffs' motion for summary judgment or for determination of a *prima facie* case and reference to a Magistrate or Special Master as to Count III is denied. Mobil's motion for summary judgment with respect to Count III is granted and Mobil's motion for decertification of the class with respect to plaintiffs' Count III claim for actual damages is dismissed as moot.

SO ORDERED.