ANTI–MONOPOLY, INC., Plaintiff,

v.

HASBRO, INC., Toys "R" Us, Inc. and K Mart Corporation, Defendants.

No. 94 Civil 2120 (LMM).

United States District Court, S.D. New York.

March 31, 1997.

896

Carl E. Person, New York City, for Anti–Monopoly, Inc.

Dennis P. Orr, Shearman & Sterling, New York City, Gary L. Reback, Susan Abouchar Creighton, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Steven A. Maddox, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Hasbro, Inc.

Brooks R. Burdette, Schulte, Roth & Zabel, New York City, for Toys "R" Us, Inc.

Neal R. Stoll, Skadden Arps Slate Meagher & Flom, LLP, New York City, Gary L. Reback, David J. Berger, John Mathias Horan, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for K Mart Corporation.

### MEMORANDUM AND ORDER

McKENNA, District Judge.

Family board game manufacturer Anti–Monopoly, Inc. ("AMI") commenced this antitrust action against its competitor, Hasbro, Inc. ("Hasbro"), alleging, among other things, violations of §§ 1 and 2 of the Sherman Act, §§ 3 and 7 of the Clayton Act, the Robinson–Patman Act, and state law.[1] Has-

---

1. Toys "R" Us, Inc. ("TRU") and K Mart Corporation ("Kmart") have settled their dispute with

bro moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to dismiss AMI's Second Amended Complaint. Hasbro also moves for partial judgment on the pleadings to dismiss AMI's secondary-line Robinson–Patman Act claims.[2] For the reasons set forth below, Hasbro's motions are granted and AMI's Second Amended Complaint is dismissed in its entirety. The other motions pending before the Court are either disposed of in this Memorandum and Order or are dismissed as moot.[3]

## I. Factual Background

### A. The Rise and Fall of Anti–Monopoly

In 1973, AMI introduced Anti–Monopoly into the marketplace, a board game in which "players broke up monopolies by bringing antitrust suits against monopolists." (Anspach Decl., 7–15–96, ¶¶ 1, 16.) AMI sold over 400,000 Anti–Monopoly games in the United States between 1973 and 1976, despite the concession of AMI's founder and president, Ralph Anspach, that the subject matter of the game was not well understood by the public. (Id. at ¶¶ 16, 16a; Person Decl., 7–15–96, Ex. C6.)

In 1976, AMI was temporarily enjoined from using the word "Monopoly" in the title of its game on the ground that it infringed the mark owned by Parker Brothers for its popular board game, Monopoly.[4] In 1982, the Ninth Circuit Court of Appeals concluded that the word "Monopoly" as applied to board games had become generic and invalidated Parker Brothers' trademark registration. *Anti–Monopoly, Inc. v. General Mills Fun Group., Inc.*, 684 F.2d 1316, 1326 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). During the period of the injunction, AMI continued to sell Anti–Monopoly under a different name.

In 1977, before the Ninth Circuit's decision was rendered, AMI introduced a second board game, which Anspach describes as an "upgrade" of the board game Monopoly. (Anspach Decl., 7–15–96, ¶ 16b.). Precluded from using "Monopoly" in the board game's title, AMI called the game "Choice." (*Id.*) In 1983, after Parker Brothers' trademark was invalidated and the injunction against using "Monopoly" was lifted, AMI changed the name of Choice to Anti–Monopoly II. (*Id.* at ¶ 16c.) In 1987, believing that consumer confusion between Anti–Monopoly and Anti–Monopoly II was harming sales of the latter, "completely different," game, Anspach caused AMI to cease the production of the original game and remove the "II" from the name of the latter game. (*Id.* at ¶ 17; Person Decl., 7–15–96, Ex. C6.) It is sales of the second Anti–Monopoly game which AMI claims have been harmed by Hasbro's allegedly anticompetitive conduct.[5]

According to AMI's records, Choice sold 2,557 units in the United States in 1980 and 1,939 units in 1981. After Choice's name was changed to Anti–Monopoly II, the game's United States sales increased from 1,416 units in 1983 to 12,648 units in 1986 to its peak of 42,218 units in 1989. (Person Decl., 7–15–96, Ex. C6.) In 1990, the year Anti–Monopoly (formerly Anti–Monopoly II) was

---

AMI and are no longer defendants in the action. AMI alleged other violations of the antitrust laws that were dismissed in an earlier Memorandum and Order of the Court. *See Anti–Monopoly, Inc. v. Hasbro, Inc.*, 1995 WL 380300 (S.D.N.Y.1995).

2. Prior to the completion of discovery, Magistrate Judge Peck, who oversaw discovery in this action, stayed AMI's apparently onerous discovery requests relating to AMI's secondary-line Robinson–Patman Act claims to allow Hasbro to move before this Court for judgment on the pleadings to dismiss those claims. *See* Opinion and Order of Magistrate Judge Peck, dated March 6, 1996. Because the Court grants Hasbro's motion, the issue of discovery relating to those claims is now moot. The remainder of discovery is complete. ·

3. In addition to the above motions, AMI moves for summary judgment as to liability on certain of its antitrust claims and Hasbro moves for sanctions claiming that AMI's motion is frivolous. Because the Court grants Hasbro's motion dismissing AMI's Second Amended Complaint in its entirety, AMI's motion is denied. Hasbro's motion for sanctions is also denied.

4. For a brief history of the board game Monopoly and the trademark litigation, see *Anti–Monopoly v. General Mills Fun Group*, 611 F.2d 296, 299–300 (9th Cir.1979).

5. AMI also produces a third board game, Star Peace.

dropped by the mass retailers, including TRU and Kmart, AMI sold only 3,400 units of Anti–Monopoly, and has since not sold more than 3,000 units in any year. (*Id.*; Anspach Decl., 7–15–96, ¶ 51.) TRU and Kmart stopped selling Anti–Monopoly because, in the opinion of their game buyers, it lacked consumer appeal. (Boyle Decl. ¶ 2; Christensen Decl. ¶ 5.) In 1995, the most recent statistic available, AMI sold only 460 units of Anti–Monopoly in the United States.

Parker Brothers, presently a subsidiary of Hasbro, bought the trademark to Anti–Monopoly, and licensed it back to AMI. (*See* Person Decl., 7–15–96, Ex. Q5.) After AMI's prior distributorship agreement with Elite Games Group expired, AMI approached Hasbro with a "proposition" for Hasbro to market Anti–Monopoly through its subsidiary, Milton Bradley, which Hasbro refused. (Anspach Decl., 7–15–96, ¶¶ 57, 59–60.) Perhaps the explanation for this lawsuit is Hasbro's refusal to market Anti–Monopoly. Anspach claims that "[t]he present market share (and power) of Hasbro gives it a better chance of success than if a board game were marketed by another manufacturer. Accordingly, from a business standpoint, there is an element of guarantee inherent in Hasbro's monopolistic position." (*Id.* at ¶ 48.) After Hasbro rejected AMI's "proposition," AMI commenced this antitrust action. (*Id.* at ¶ 60.)

### B. The Board Game Industry

A picture of the board game industry in the United States is difficult to discern from the parties' papers. AMI's papers are replete with conclusory statements and lack organization and coherence. Hasbro's papers, in contrast, strategically omit any comprehensive discussion of the board game industry apparently because Hasbro contends that the relevant market in this case consists of portions of the "toy and game" industry in which Hasbro's market share is far more limited. Despite this difficulty, for the purposes of the instant motions, the Court is able to conclude the following when the facts

are viewed in the light most favorable to AMI.

Hasbro possesses approximately 70% of the games and puzzles market, which constitutes approximately 14% of the total toy industry. (Person Decl., 7–15–96, Ex. L2) Family board games, the putative relevant market in this case, is a subset of those products included in the games and puzzles market.

AMI defines family board games as "non-strategy board games, in which players move tokens on a board surface, and the games are suitable for players at least 7–8 years old and are targeted for group play which does not exclude the 7 or 8 to 18 year age group." (Second Am. Compl. ¶¶ 12, 15.) AMI has not supplied facts to show that the market statistics on which it relies are based on this narrow definition. The president of NPD Group, Inc. ("NPD"), which compiled the market data, confirmed that NPD "provides no formal definitions for the categories contained in its reports." (Roth Decl. ¶ 5.) Because Hasbro's own documents relate its large share of the non-electronic game industry, and because the Court can resolve the pending motions without defining the precise contours of the relevant market, the Court will assume for the purposes of the instant motions that family board games refer to a discrete class of products.[6]

According to a toy industry report, five mass retailers—TRU, Wal–Mart, Kmart, Target, and Kay Bee/Toy Works—accounted for more than 50% of the dollar sales in the toy and game industry in 1994. TRU possessed the largest retail share of toy and game sales with approximately 20% of 1994 sales. (Harrington Decl. Ex. 13, at 23; Ordover Decl., 6–12–96, ¶¶ 45–49; *see also* Anspach Decl., 2–28–96, ¶ 13.) Regarding games, the record indicates that Hasbro "owns" almost 55% of the items sold in Kmart and TRU, and over 70% of the items sold in Wal–Mart and Target. The percent-

---

**6.** In addition, AMI proposes a relevant submarket, which it coins "monopoly-type family board games" and defines as "family board games based on some of the monopolistic features of real estate and/or public utilities, including the

payment of rents to owners or users thereof." (Second Am. Compl. ¶ 12.) Because AMI has failed to provide factual support for this alleged submarket, the Court will not consider it.

age of Hasbro games sold in Kay Bee/Toy Works is not apparent from the record.

Hasbro, which includes such well-known manufacturers as Milton Bradley and Parker Brothers, is the dominant producer of family board games in the United States based on NPD-compiled statistics. Some of the historically more popular board games distributed by Hasbro include: Monopoly, Life, Risk, Scrabble, Outburst, Pictionary, and Trivial Pursuit. (*See* Hasbro, Inc.1994 Annual Report, Harrington Decl. Ex. 5.) NPD statistics indicate that Hasbro sells 70.3 percent of the family board games sold in the United States, and sold the five best-selling games in the first half of 1993. (Person Decl., 7–15–96, Exs. I2 & B6.) As of June 1993, Tyco was apparently the next largest family board game manufacturer in the United States with less than 10 percent of the market. (*Id.* Ex. I2.) Other market participants include Pressman Games and a number of smaller manufacturers.

The parties agree that it is neither difficult nor expensive to manufacture a new board game, but disagree as to whether it is easy to enter the board game market. (Second Am. Compl. ¶ 15(D); Harrington Decl. Ex. 6, at 2; Orbanes Decl. ¶ 26; Wilson Decl. 4.) Hasbro concedes that the mere ability to manufacture a board game does not guaranty its success. Of 42 games introduced by Parker Brothers and Milton Bradley in 1991 only 21 were still being offered for sale by 1994. (Orbanes Decl. ¶ 31.) Moreover, board games sold by the mass merchants are much more likely to garner large volumes of sales in the short term than those sold only in regional department stores or individual toy and game stores.

An independent manufacturer has a number of choices when it decides to introduce a new game. The most common method is to license the game to one of the major manufacturers, such as Hasbro. (Hersch Decl. ¶ 6.) An independent manufacturer may also choose to market its game directly to retailers, bearing the attendant costs and risks. (Hersch Decl. ¶ 7.) The mass retailers are less likely to accept a game for sale if it doesn't promise substantial sales in a short period of time. (Orbanes Decl. ¶ 26; Christensen Decl. ¶ 2.) This reluctance makes it more difficult for smaller manufacturers, with less capital for national advertising, to place their games in the mass retailers. However, a manufacturer can successfully launch a game through smaller retail stores, such as local department stores and independent game stores. Examples of games that achieved national success by first approaching smaller retail stores include Pictionary, Scruples, and Mindtrap. (Orbanes Decl. ¶ 27.)

### C. Hasbro's Purported Anti-Competitive Acts

AMI's various antitrust claims are premised on the same facts, which the Court concludes fall into two general categories.[7] First AMI claims that certain Hasbro discounts and promotions available to mass retailers, such as TRU, are purportedly not available to smaller retailers, and are thus discriminatory. Second, AMI claims that certain Hasbro practices, including volume discounts that benefit the mass retailers, discourage those retailers from purchasing non-Hasbro games, such as Anti–Monopoly, and thus harm competition. Much of AMI's alleged evidence focuses on innuendo based on communications between Hasbro and TRU, and/or vague inferences from ambiguous documents and testimony.

### 1. Retailer Discrimination

AMI claims that Hasbro discriminates against smaller retailers in favor of the mass retailers, such as TRU. According to AMI, it is harmed by this discrimination because

---

7. In addition to the facts based on deposition testimony and sworn declarations, AMI has submitted purported expert opinions based on a long litany of "assumed" facts, which were prepared by AMI's counsel. (*See* Person Decl. Exs. C, D, E, F, G, I.) In these assumed facts, AMI asked its experts to accept as true, among other things: (1) AMI's alleged market definition; (2) the allegations of Hasbro's illegal pricing practices and their anticompetitive effects contained in AMI's complaint; (3) the "fact" that Hasbro's prices are predatory; and (4) the "fact" that Hasbro and TRU conspired to refuse to deal with Anti–Monopoly in exchange for discriminatory discounts. Needless to say, the Court does not accept these unsupported and assumed facts as true for the purposes of the instant motions.

smaller retailers cannot compete with the mass retailers, which causes them to go out of business and provides fewer stores in which to sell Anti–Monopoly.

The nature of this alleged discrimination includes offering the mass retailers promotional and advertising discounts of which smaller retailers are unaware (*see, e.g.* Person Decl., 7–15–96, Exs. M3, U3, I4, J4; Person Decl., 3–1–96, ¶¶ 5–7, 11–19; Canfield Decl. ¶¶ 3–12; Goldstein Decl. ¶¶ 4–12); supplying only the mass retailers with personnel to stock their shelves (Hall Dep. 150–54; *see also* Person Decl., 4–5–96, Ex. AA; Goldstein Decl., 2–15–96, ¶ 11); and providing the mass retailers with a preview of Hasbro's product line before it is introduced to the other retailers (*see* Hall Dep. 38–45; Canfield Dep., 1–4–96, ¶¶ 13, 15–16).

Although AMI has supplied the Court with numerous documents referring to Hasbro discounts or promotions, the Court notes that AMI has failed to provide context to the documents by explaining the nature or conditions of the discounts. Thus, although AMI claims that Hasbro's discounts are discriminatory, it is difficult for the Court to conclude that they are, based on the inadequate information before it. However, some small retailers have indicated in sworn declarations that discounts available to the mass retailers are not available to them. Liberally construing the evidence in AMI's favor, the Court will assume for the purposes of the instant motions that some of Hasbro's discounts and promotions discriminate against smaller retailers in favor of the mass retailers.

### 2. Other Hasbro Practices

In addition to Hasbro's allegedly discriminatory policies outlined above, AMI complains about a number of other Hasbro practices. AMI claims that Hasbro refuses to sell only its "hot" games to retailers, instead conditioning the sale of such "hot" items on the purchase of more poorly performing items. (Hosea Dep. 89–92; Wilson Dep. 73.) According to E. David Wilson, president of Hasbro's Games Group, allowing a retailer to purchase only the "cream of the crop" would be "harmful for our business." (Wilson Dep. 72.)

AMI also claims that Hasbro has conspired with certain mass retailers to fix the prices of Hasbro's board games by negotiating TRU's profit margin. (Person Decl., 3–1–96, ¶ 3, Person Decl., 4–5–96, ¶¶ 11–13, 22.) AMI's alleged evidence of this price fixing scheme includes the testimony of Jill Hall, a board game buyer for TRU. According to Hall, TRU approaches Hasbro when TRU has excess inventory of games in order to negotiate a markdown, or discount price, which allows TRU to sell its remaining inventory on the unpopular product at a lower price while still turning a profit. (Hall Dep. 73–75, 218–21.) Although some smaller board game manufacturers did not receive similar markdowns from Hasbro for their remaining inventories, apparently some did. (*See* Canfield Decl., 1–4–96, ¶ 3; Person Decl., 4–5–96, Exs. S, U, & V.) Other than these negotiated markdowns, there is no evidence suggesting that TRU and Hasbro negotiated TRU's profit margins. Hasbro was apparently aware of TRU's profit margins, however, because it notified TRU that it thought TRU's prices were too high in correspondence referring to those profit margins. (Person Decl., 4–5–96, Ex. BB.)

AMI also complains about Hasbro's volume discounts on the ground that they discourage the mass retailers from purchasing Anti–Monopoly. (*See* Person Decl., 3–1–96, ¶ 5; Person Decl., 3–1–96, Exs. E, M.) The percentage of Hasbro's volume discount increases as the quantity of Hasbro items purchased increases. AMI offers a hypothetical example to explain how it has been harmed by Hasbro's volume discounts. TRU, AMI theoretically explains, foregoes the purchase of Anti–Monopoly for fear that profitable sales of Anti–Monopoly will cut into TRU's sales of Hasbro products, which will reduce the percentage of TRU's volume discount. Because, according to AMI, the loss of even a small percentage increase in volume discount on the entire line of Hasbro's products carried by TRU far exceeds TRU's potential profit on Anti–Monopoly, it would not make economic sense for TRU to carry Anti–Monopoly. (Person Decl., 3–1–96, ¶ 5.) For similar reasons, AMI claims that a number of Hasbro discounts are anticompetitive. (*See* Person Decl., 3–1–96, ¶¶ 12–17; Person Decl., 4–

5–96, ¶¶ 30–38.) AMI has provided no factual support for its theory.

## II. Discussion

### A. Standard of Review

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]he mere existence of *some* alleged factual dispute ... will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### B. Market Power

■ Although market power is not an essential element of all of AMI's claims—*see K.M.B. Warehouse Dist., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir.1995) (market power is not a prerequisite to all § 1 Sherman Act claims)—to sustain most of its claims, AMI must show that Hasbro possesses market power in the putative relevant market, family board games. Market power is "the ability to raise price significantly higher than the competitive level by restricting output." *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.,* 784 F.2d 1325, 1331 (7th Cir.1986) (Easterbrook, J.); *see also* Phillip E. Areeda et al., Antitrust Law, Volume IIA, ¶ 501 (1995) [hereinafter "Antitrust Law"]. Market share is frequently reflective of market power, and thus a showing that a defendant possesses a large share of a well-defined market is usually sufficient to demonstrate market power. *See K.M.B. Warehouse,* 61 F.3d at 129 ("market share may be a proxy for market power"); *Eastman Kodak Co. v. Image Technical Services,*

*Inc.,* 504 U.S. 451, 452, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992) (Kodak's possession of "nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes," was sufficient to withstand Kodak's summary judgment motion).

#### 1. Market Definition

■ The relevant inquiry for market definition is whether a hypothetical union of all producers of the product or products in the putative market would possess significant power over price. If so, then the product or products comprise a relevant market. *See* Antitrust Law, Volume IIA, ¶ 533c; Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, at 10–11 (April 2, 1992). In the instant case, the question is whether a hypothetical union of all producers of family board games would possess significant power over the price of family board games. If so, then family board games is the relevant market. If a hypothetical union of all producers of family board games would not possess significant power over price, that is, if consumers would purchase alternate products rather that pay the inflated price for family board games, then family board games defines the market too narrowly. The products to which the consumer would turn in light of the more expensive games would also be part of the relevant market.

The Supreme Court has recognized that "[t]he relevant market for antitrust purposes is determined by the choices available" to the consumer. *Kodak,* 504 U.S. at 481–82, 112 S.Ct. at 2090 (citing *Jefferson Parish,* 466 U.S. at 19, 104 S.Ct. at 1562); *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962). The Court set the standard for market definition in *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "[N]o more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." *Id.* at 395, 76 S.Ct. at 1007.

In the instant case, the parties have submitted various analyses to support their re-

spective definitions of the relevant market. The reason is clear. If family board games were accepted as the relevant market, then, because there is some evidence that Hasbro possesses approximately 70% of that putative market, Hasbro's market share would evidence market power. In contrast, if Hasbro were correct that family board games compete with a "cluster" of toys and games, then the relevant market would include products manufactured by toy powerhouse Mattel, Inc., among others, and Hasbro's share of the relevant market, according to Hasbro's expert, would be less than 25%, too low to evidence market power. *See Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F.Supp. 455, 473–74 (S.D.N.Y.1996) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)).

■ To satisfy its burden relating to market definition, AMI has submitted the expert declarations and cross-elasticity reports of Ralph Anspach, AMI's president, and that of economist C. Daniel Vencill.[8] In these reports, Anspach and Vencill conclude, based on their respective analyses of NPD data, that family board games comprise a relevant antitrust market because they have "low interchangeability with other games such as adult games, puzzle games, standard games, family action games, and strategy games." (Vencill Report, 7–14–96, at 4; Anspach Decl., 7–15–96, at ¶ 66.) Hasbro's expert, Janusz A. Ordover, finds numerous computational and conceptual flaws with AMI's experts' analyses, leading him to comment that they "would receive a failing grade if submitted by a graduate student in my industrial organization classes at NYU." (Ordover Report, 8–7–96, at ¶ 1.) Ordover's analysis concludes that the relevant market consists of toy and game "clusters," which are based on the price of the item and certain demographic characteristics of the intended user.

## 2. Barriers To Entry

Even were AMI's market definition accepted for the purposes of the instant motions, large market share is not dispositive of a determination of market power. "Market power comes from the ability to cut back the market's total output and so raise price." *Ball Memorial Hospital,* 784 F.2d at 1335. In other words, even if family board games constituted the relevant market, and even if Hasbro possessed 70% of that market, Hasbro would not have market power if it could not significantly raise price by restricting output.

■ Where barriers to entry into the relevant market are low, a defendant's large market share may not accurately reflect market power. *See United States v. Waste Management., Inc.* 743 F.2d 976, 983 (2d Cir. 1984); *Ball Memorial,* 784 F.2d at 1335. In *Waste Management,* the government challenged the acquisition by Waste Management, Inc. ("WMI"), a solid waste disposal company, of a competitor in the Dallas area. If allowed, the merger would have resulted in WMI controlling 48.8% of a certain category of the waste disposal business in the Dallas area, sufficient to constitute prima facie evidence that the merger was illegal. *Waste Management,* 743 F.2d at 976. Declining to find that the merged company would possess market power, the Second Circuit recognized that "entry into the relevant product and geographic market by new firms or by existing firms in the Fort Worth area is so easy that any anti-competitive effect of the merg-

---

**8.** Hasbro objects to these documents on two grounds: (1) they violate Rule 26 because they were first submitted in response to Hasbro's summary judgment motion; (2) Magistrate Judge Peck precluded Vencill and Anspach from offering any opinions in this case other than those based on the assumed facts they relied on in their initial Rule 26(a)(2) expert reports. (Hasbro Reply Mem. 8–9.)

Hasbro is simply incorrect that AMI's expert submissions violate Magistrate Judge Peck's order. The substance of that order was to preclude AMI's experts from using certain information produced by Hasbro to supplement their expert analyses. (Harrington Decl. Ex. 1, at 26–29.) However, the Vencill and Anspach declarations explicitly indicate that they are based on independently acquired information; not information produced by Hasbro. (Vencill Decl., 7–14–96, ¶ 14; Anspach Decl., 7–15–96, ¶ 13.) While Hasbro may be correct that these expert analyses violate Rule 26, Hasbro has not shown that it is prejudiced by their submission because it admittedly possessed the information upon which AMI relied for its own reports.

er before us would be eliminated more quickly by such competition than by litigation." *Id.* at 983; *see also* Antitrust Law, Volume IIA, Section 4C.

■ Hasbro, relying on recent market participants, claims that barriers to entry into the family board game market are low, precluding a finding that it has market power. Hasbro points out that a common trade magazine publishes the names of companies and individuals who can assist in the development, production, and marketing of a new game, indicating that even a manufacturer with little experience in the industry could introduce a game. (Orbanes Decl. ¶ 26.) In addition, the president of Hasbro's Games Group, E. David Wilson, claims, and AMI does not dispute, that most successful games in recent years were introduced by small independent game manufacturers. (Wilson Decl., 6–12–96, ¶¶ 3–4.) Wilson cites as examples, Mindtrap, Advertising, Where in the World is Carmen San Diego?, Brain Quest, Pictionary, and Trivial Pursuit. (*Id.; see also* Angel Decl. ¶¶ 5–9 (development of Pictionary); Hersch Decl. ¶ 8 (development of Out of Context); Ware Decl. ¶ 3–13 (development of Trivial Pursuit).) [9]

AMI does not refute Hasbro's historical data, but contends in conclusory fashion that "[t]he current board game market is rigged against potential non-Hasbro-developed staples getting a foothold in the market. Therefore, the frequency of success of new games becoming staples cannot be determined on the basis of past history." (Anspach Decl., 7–15–96, at ¶ 45.) It further claims that a successful competitor must be able to place its games in the mass retailers, which requires substantial capital investment for marketing and advertising. (AMI Oppos. Mem. 10; Second Am. Compl. ¶ 15(D); Harrington Decl. Ex. 6, at 2; Anspach Decl., 7–15–96, ¶¶ 32–33.) AMI also points out that the attendant risk associated with introducing a new game discourages new entrants.

The Court notes that AMI's evidence relating to barriers to entry is nonspecific and largely speculative, while Hasbro's evidence is based on actual market participants. Unrebutted evidence that actual competitors have entered the market is a strong indicator that Hasbro lacks market power. See Antitrust Law, Volume IIA, ¶¶ 420b, 422c. This follows because these new entrants provide a check on Hasbro's ability to charge monopoly prices or otherwise exercise market power. In the face of Hasbro's evidence that most of the recent, successful board games have been introduced by small, independent game manufacturers, AMI has failed to set forth facts to show that barriers to entry into the putative family board game market are high.

■ Nevertheless, the Court need not resolve the pending motions by finding that Hasbro lacks market power in the relevant market, which in any event is usually a question of fact, not law. *Sunshine Cellular v. Vanguard Cellular Sys.,* 810 F.Supp. 486, 493 (S.D.N.Y.1992) (citing *Jennings Oil Co. v. Mobil Oil Corp.,* 539 F.Supp. 1349, 1352 (S.D.N.Y.1982)). Indeed, experts are not always essential to defining the relevant market. *See United States v. Pabst Brewing Co.,* 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966) (government need not prove "by an army of expert witnesses what

---

9. Hasbro also claims that the nature of the competition among toy and game retailers negates a finding of market power. Hasbro explains that the top five retailers in the toy and game industry in the United States sell approximately 50% of all toys and games. TRU, the largest of these retailers, sells approximately 20% of all toys and games. (Harrington Decl. Ex. 13.) According to Hasbro, TRU is so powerful that the Federal Trade Commission ("FTC") claims TRU was able to stop Hasbro from selling its products to various customers, including warehouse clubs. (Hasbro Mem. 8; Harrington Decl. Ex. 14, ¶¶ 4–7.)

The record does not allow the Court to draw the inferences necessary to conclude that competition in the retail business for games restricts Hasbro's ability to control prices in the putative family board game market. First, Hasbro cites to information for the broader toy and game industry. Thus, the record does not sufficiently establish who the retail players are in the family board game market nor their effect on Hasbro. Second, even if the FTC complaint, upon which Hasbro relies for its claim, were sufficient to show that TRU was able to restrain the quantity of Hasbro sales to TRU's retail competitors—which it is not—it still would not show that TRU sufficiently restrains Hasbro's ability to control prices on the games sold to TRU or other retailers.

constitutes a relevant 'economic' or 'geographic' market"). Thus, the Court assumes, for the purposes of the instant motions, that Hasbro has market power in the family board game market.

## C. Antitrust Standing

■ To recover damages under § 4 of the Clayton Act an antitrust plaintiff must show that it has antitrust standing. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). To determine whether AMI has antitrust standing, the Court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535, 103 S.Ct. at 907. In *Associated General,* the Supreme Court recognized a number of factors relevant to a determination of antitrust standing, including the nature of plaintiff's alleged injury. *Id.* at 538, 103 S.Ct. at 908–09.

### 1. Alleged Discrimination

■ AMI has not clearly articulated how it is injured by Hasbro's allegedly discriminatory practices. To the extent that Hasbro charges smaller retailers more for Hasbro games than it charges the mass retailers, AMI is benefitted because it can more easily place Anti–Monopoly in these smaller retailers. To the extent AMI claims that Hasbro charges the mass retailers too little, its claim is simply one for predatory pricing and not for discrimination. (*See* Anspach Decl., 2–28–96, ¶¶ 15–23.)

AMI's argument appears to rely on the fact that the retail market for family board games is being consolidated by a few mass retailers. Because this consolidation is causing the smaller retailers to go out of business, AMI allegedly cannot succeed by selling to only the smaller retailers. The Court notes that if AMI's theory of injury to small retailers based on Hasbro's allegedly unjusti-

fied discriminatory conduct were correct, it is somewhat curious that the small retailers have not instituted an action on their own behalf. Moreover, AMI has not provided factual support for its claim that the purported retailer consolidation is related to the Hasbro practices about which AMI complains.

■ The Court finds that AMI's theory lacks factual support, and in any event is too indirect, speculative, and tenuous to support antitrust standing. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 230–31, 113 S.Ct. 2578, 2591–92, 125 L.Ed.2d 168 (affirming summary judgment where facts do not support plaintiff's theory); *Associated General,* 459 U.S. at 545–46, 103 S.Ct. at 912–13 (recognizing that the tenuous and speculative nature of the relationship between alleged antitrust violation and injury, and the existence of more direct victims, weigh heavily against a finding of antitrust standing).[10]

Because AMI lacks antitrust standing to pursue its discrimination claims, the Court grants Hasbro's motion for summary judgment as to all of AMI's claims to the extent they allege that Hasbro discriminated against smaller retailers in favor of the mass retailers.

### 2. Pricing Practices

■ Antitrust injury, a necessary component of antitrust standing, is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986). Absent predatory pricing, an antitrust plaintiff cannot complain that its competitor's prices are too low. In *Atlantic Richfield,* the Court explained:

10. Hasbro correctly points out that, under the Robinson–Patman Act, a secondary-line violation would occur if game retailers, that is, Hasbro's customers, suffered antitrust injury because of Hasbro's alleged price discrimination. *See Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 583–84 (2d Cir.1987). In contrast,

a primary-line injury refers to injury to Hasbro's competitors, such as AMI. *Id.* AMI does not have antitrust standing to pursue the alleged secondary-line claims of Hasbro's customers. For that reason, Hasbro's motion for judgment on the pleadings to dismiss AMI's secondary-line Robinson–Patman Act claims is granted.

When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation. A firm complaining about the harm it suffers from nonpredatory price competition "is really claiming that it [is] unable to raise prices." ..: This is not antitrust injury; indeed, "cutting prices in order to increase business is the very essence of competition." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 337–38, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333 (1990) (citations omitted).

■■■ To sustain its claim for predatory pricing, AMI must prove (1) that Hasbro's prices are below an appropriate measure of Hasbro's costs; and (2) that Hasbro had a dangerous probability (or a reasonable prospect under the Robinson–Patman Act) of recouping its investment in below-cost prices. *Brooke Group,* 509 U.S. at 222–24, 113 S.Ct. at 2587–88. AMI has not provided factual support for either element of a below-cost pricing antitrust claim. Instead, AMI theorizes that Hasbro can achieve instant recoupment by pricing Monopoly below cost. Hasbro allegedly achieves this instant recoupment when the consumer enters TRU to buy Monopoly, but then decides to buy another Hasbro product. (Anspach Decl., 4–3–96, ¶ 19, 27–31.) AMI's factually unsupported theory is not sufficient to support a claim. *Id.* at 230–43, 113 S.Ct. at 2591–98.

To the extent that AMI claims that Hasbro's discounts and other promotional allowances cause its prices to be too low, AMI has failed to show that it has suffered antitrust injury. This is true regardless of the statute under which AMI's antitrust claims are based. *Atlantic Richfield,* 495 U.S. at 340, 110 S.Ct. at 1892; *see also Cargill,* 479 U.S. at 116, 107 S.Ct. at 492 (holding that plaintiff must show predatory pricing under § 7 of the Clayton Act); *Brooke Group,* 509 U.S. at 221–23, 113 S.Ct. at 2587 (holding that predatory pricing claim under both § 2 of Sherman Act and under the Robinson–Patman Act require plaintiff to show that its competitor's prices are below an appropriate measure of the competitor's costs).

## D. Hasbro Has Not Violated the Antitrust Laws

■■■ To the extent that AMI might have antitrust standing, it has failed to provide factual support for its allegations of anticompetitive conduct. For example, AMI has failed to support its § 2 claim for conspiracy to monopolize or its § 1 claim alleging a "contract, combination ... or conspiracy" in restraint of trade with evidence of concerted action. *See Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (recognizing that independent action is not proscribed under § 1); *Volvo North America Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988) (recognizing that element of conspiracy to monopolize under § 2 requires concerted action). Concerted action means "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

■■■ AMI apparently claims that, because TRU discusses its profit margin with Hasbro when it negotiates certain wholesale discounts, including post-sale markdowns to reduce inventory, there is evidence of concerted action. The Court does not agree. In *Monsanto,* the Supreme Court recognized that "[a] manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market." *Monsanto Co.,* 465 U.S. at 762, 104 S.Ct. at 1470. The Court cautioned against drawing an inference of a price fixing agreement from ambiguous evidence. *Id.* at 763, 104 S.Ct. at 1470.

Calling the evidence ambiguous would be generous. AMI has not pointed to any exhibits or non-hearsay testimony to support its claim that Hasbro had an express or implied agreement to fix prices with TRU or any other retailer. A lack of factual support is fatal to AMI's conspiracy claims. *See Schwimmer v. Sony Corp. of America,* 677 F.2d 946, 953–54 (2d Cir.) (plaintiff failed to introduce sufficient facts from which an inference of agreement to discourage trans-

shipping could be drawn), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).

The distinct and significant problem with all of AMI's antitrust claims is that they lack factual support in the record. Accordingly, all of AMI's antitrust claims are dismissed.

### E. State Law Claim

"When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims." *Baylis v. Marriott Corp.,* 843 F.2d 658, 665 (2d Cir.1988) (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). The Court is not convinced that all bases for federal jurisdiction relating to AMI's state law claim have been eliminated. On the face of the complaint it appears that there is complete diversity between AMI and Hasbro, and thus the Court may still have federal jurisdiction over AMI's state law claim. (Second Am. Compl. ¶¶ 4, 5.)

In any event, the Court believes that in this case, in which AMI has entirely failed to provide factual support for both its federal and state law claims, allowing AMI to pursue its state law claim in state court would be a waste of the resources expended to resolve the parties' dispute. Discovery is complete, and Hasbro has properly moved for summary judgment to dismiss AMI's one state law claim for tortious interference with business advantage. The Court will also resolve this aspect of Hasbro's motion.

To state a claim for tortious interference with business advantage, "a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). AMI has not set forth any partic-

ular business relation with which Hasbro interfered; nor has it set forth any facts that Hasbro intended to harm AMI; nor has it set forth facts to show that Hasbro used dishonest, unfair, or improper methods to compete with AMI. Accordingly, AMI's state law claim is dismissed with prejudice.[11]

### III. Conclusion

For the reasons set forth above, Hasbro's motion for summary judgment dismissing AMI's Second Amended Complaint is granted. The Court also grants Hasbro's motion for judgment on the pleadings dismissing AMI's secondary-line Robinson–Patman Act claims. The other pending motions are disposed of in the above Memorandum and Order or are dismissed as moot. The Clerk is directed to enter judgment dismissing the Second Amended Complaint.

SO ORDERED.

---

**11.** The Court also notes that, under New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue. *See Bombard v. Central Hudson Gas & Electric,* 205 A.D.2d 1018, 614 N.Y.S.2d 577, 580 (3d Dep't 1994); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 828 F.Supp. 1114,

1129 (S.D.N.Y.1993) (recognizing that parties failure to address claim raised in adversary's papers may indicate abandonment), *aff'd,* 32 F.3d 690 (2d Cir.1994). AMI failed to provide any argument opposing Hasbro's motion relating to AMI's state law claim, which provides an independent basis for dismissal.